If you say you're going to split your time when someone keeps talking they're taking up someone else's time and it's important that everyone gets an opportunity and I guess you know I I guess I want to thank whoever gave us some extra reading yesterday afternoon but but I have one question before we start is and it doesn't indicate here is this an opposed motion for judicial notice or what is the situation on that? I'm the one who filed the motion and I don't know whether it's opposed because we decided after looking at things on very short notice to add these to the record. Maybe someone from the FERC side could let me know whether it's opposed. I don't if they're not at the mic is it recording? So come forward and just let me know what your position is on that. Berk does oppose. It is opposed? It is opposed. I have not seen it. The only reason I know that something was submitted yesterday was because the Council of the Department of Justice was informed over as Blackberry. We do oppose it. Thank you. All right well we'll just basically take this under submission then. You only have 20 minutes each slide so I don't want to this is all stuff that's occurred subsequently so I don't want to spend a lot of time on that. All right now you brought the chart in here. Since they haven't seen your judicial notice have they seen your credit report? They've not had a chance to access the list yet. You've brought a rule. With that chart? They have. These charts are from the record. We have a copy here so I just want to make sure that there's nothing that they haven't seen. Good morning. Good morning, Your Honor. May it please the court, I'm Jonathan Feil representing the Petitioners, Cowlitz Indian Tribe, Friends of the Cowlitz and CPR Fish. I would like to focus my argument this morning on four main issues. Are you going to do all the argument? I'm going to do the full argument for Petitioners as I am their sole counsel. All right. And how long do you want to reserve for rebuttal? I would reserve seven minutes for rebuttal. All right. Thank you. I appreciate your watching the clock. I was told last oral argument by the presiding judge that it was my responsibility but I appreciate. I'll try. Thank you so much. I would like to focus this morning in my presentation to the panel on four main issues. First, the Federal Energy Regulatory Commission or FERC's failure to adjudicate the license violation complaint that unlawfully lowered the bar for Tacoma's duties during the new license term. Second, I would focus on our argument that the biological opinion no jeopardy conclusion defies its own assessment of the effect of delaying improvement to degraded habitat conditions, particularly delaying the possibility of reaching target fish passage survival rates within three years. Third issue I would focus on is that the agencies disregarded their best science and evidence of jeopardy by failing to require volitional upstream passage plans in the first instance from Tacoma. Fourth issue I would focus on is that the license terms for fisheries and hatchery management further lower the bar from the original license. Beyond those issues I wish to address very briefly the flood control article in the Advisory Committee Act and then I'd conclude the opening with the relief requested. FERC's failure to adjudicate the license violation complaint unlawfully lowered the bar for Tacoma's duties during the new license term. We've explained in our brief Tacoma's original promises in its original license, a license that constitutes a binding contract between the United States and the licensee, binding promises regarding habitat access and fish production, binding promises to use the best science and technology for fish passage and fish production during the original license term. I brought with me an excerpt from the record that is a map of the Cowlitz River Basin in which we have indicated, I better not step away from the microphone, in which we have indicated over to the right the area of the Cowlitz River Basin that is upstream of the Mossy Rock Dam and the Rife Lake impoundment that it creates. One can see from this diagram just how much upper habitat it was that Tacoma committed in the original license to make available for anadromous fish production. As we indicated in our brief, approximately 80% of the production of fish species that are now listed under the Endangered Species Act took place in that area before the introduction of Mossy Rock Dam in the late 1960s. The violations were clearly alleged in the complaint that was filed with the commission initially and then was before this court in Friends of the Cowlitz versus FERC. Those violations were a delay of decades in instituting any means of allowing juvenile fish spawning in that upper watershed to make it down through the river to maturity so that they could go through the life cycle in which salmonids returned to spawn. There was no upper watershed smolt recovery at all until the 1990s and what it took was a lawsuit from my client, Friends of the Cowlitz, that I brought in this court against Bonneville Power Administration when I was younger and had less gray hair and was an associate in my firm in 1990. That was the first time after a 1951 license that there was anything permanently to be in place and it wasn't a requirement on Tacoma. It was a requirement on Bonneville Power Administration, not even the licensee, which acceded to it in settlement in order to create essentially a catcher's mitt up there in Cowlitz Falls, which is just ahead of Rife Lake. The commission has had two opportunities to determine whether Tacoma violated its license in the first instance. I should say it had three opportunities. Now this, just as you're going to the city's record of compliance, correct? Correct. Is that? Well, I would like to ask you, is there any language in the Federal Power Act that requires FERC to initiate an investigation about a licensee? No, it does not require an initiation of investigation, but it does require a determination, and that's under the Federal Power Act 15A3, that it must consider the record in the course of a relicensing. Okay, so that answers that question, and that was, I guess, a little bit of a rhetorical question because I think I knew the answer. But I understand that when FERC examined the city's record of compliance under the city's original license, FERC considered two previous allegations of noncompliance that FERC had already investigated and found to be incorrect, and aside from those previous allegations of noncompliance, is there any additional allegations or evidence of noncompliance in the record? Well, I must say that FERC did investigate, and they investigated incorrectly, which is what the panel of this Court held in Friends of the Callots v. FERC. It's very interesting to me that what Tacoma puts in its excerpts of record is the Commission's order, which is, in my view, directly disrespectful to this Court, because despite holding ultimately that it could not compel the policemen to enforce the law, this Court went out of its way to indicate that the FERC's interpretation of its own license was erroneous. The FERC came to this Court in that case contending that they, that Tacoma had in fact complied with the requirement of downstream fish passage because there was a fish passage device at Mayfield, almost neglecting, even forgetting that there in fact were two dams on this license. What we have in terms of FERC's record of looking at compliance, if I may stretch a bit of a metaphor, is that FERC says, okay, the deck chair inventory on the Titanic is in perfect order. This would not be an issue, Your Honor, as dramatic as it is now if it did not directly affect the new license term. Because what it does is it, if you use the term lowering the bar as something similar to the technical term environmental baseline, what you have here is Tacoma saying, new plan, new plan, new plan, new plan, new plan, new plan, as the environment is degrading, which is the conclusion in the biological opinion. The habitat is in degraded condition. If allowed to continue, it would jeopardize the continued existence of the species. And the no jeopardy determination is only based on the decision that the new license terms and conditions will not retard the recovery of the resource to fully, or should I say adequately functioning condition. So when you look at what happened in the past, the Commission has turned a blind eye to everything but essentially the requirement of reports. Tacoma was directly responsible under Article 57 of its prior license to continue to cooperate with the environmental agencies for the development of permanent fish traps at Mossy Rock. That was a requirement dating back from at least 1973. We have some 25 years later, so the complaint, Friends of the Cowlitz, we have Tacoma on record, and this is in the court's opinion in Friends of the Cowlitz v. FDRC saying, we don't want to spend any time on interim mitigation. That's one reason. We just don't want the Commission to deal with this complaint. We're only going to be looking at what we're going to do under the new license. If we look at what is involved in the prior license, we have essentially a, so to say, blowing off of the earlier license requirements. And it doesn't really require a full-level adjudication for this. This Court had no difficulty seeing in reading Article 57 that the license was required to continue to propose to the Commission permanent fish traps at Mossy Rock, and they failed to do so for a period of nearly 30 years. The other question that's raised when you look at the Court's decision in Friends of the Cowlitz v. FDRC. I take it from your last statement that the fish trap is currently in place. There is no fish trap in place at Mossy Rock. There is no fish trap being proposed at Mossy Rock unless improvements to Cowlitz Falls fail. The discussion of a so-called gulper that is in the National Marine Fisheries Service brief concerns something that's not on the table and is only planned for some time in the future if the installation of screens does not work. If it's needed. If it's determined by the licensee and their plan that it's needed or in consultation with the Fisheries Technical Committee. Which really leads me to the fact that there has been no opportunity here for any of these groups to, shall we say, have their day in court. And that is what you have in Federal Power Act 15A3. At least there's the opportunity to require that during a relicensing. It doesn't have to be an enforcement, but it must be taken into consideration at least to determine what the compensatory means should be in the new license, if not for compensation to those who have been hurt. I want to turn now to the notice. It was now taken into consideration at least to a minimal extent, right? I can't say that it was taken into consideration any more than if I said. The words are there, right? I beg your pardon? The words are there. Yes. There are words there that say we take it into consideration. So your point is what? They didn't consider it enough? They didn't examine it. How can you consider what it's like saying is I've got a big black box here, and I've considered what's inside without even opening the lid. I can say I've considered it. I can say just about anything about that. But does that make rational sense or does that tell this Court that the commission blew off the first time that this came when the Court said they had an obligation to consider it and therefore this is not merely academic. This Court spent a good deal of its opinion correcting the fact that FERC had misinterpreted its license and FERC really did not care about that. They said they wouldn't do anything about it, but how can one rationally, without violating the Administrative Procedure Act, consider something that they've decided not to look at? I turn now to the no jeopardy conclusion. It defines its own assessment of the effect of delaying improvement in a degraded habitat. The agency's own opinion is that existing conditions jeopardize the existence of listed species and further delays, and there is a place at least in the draft biological opinion where they say three years and in the other where they say they've assumed that after three years it will pop up to between 75 and 95 percent, that a delay in three years in continued existence of listed species. Your Honors, come July we are at three years. And the reason yesterday, and I would say that we decided this in preparing for oral argument very close to the wire, we presented what has been put into effect so far, and this could be a matter of simply public record looking at the orders of the commission of which proper judicial notice could be taken at the instance of this Court alone. They are just now beginning their first experiment with an improvement in a facility they don't own, which is the collection facility at Cowlitz Falls. How can one say? I think what I would look at, the documents that you presented, depending on if either side could have presented them, what I look at is they clearly weren't before the Court previously that made the decision that we're ruling. The other thing is the reason that I see that people would present them is if you're the them to say, see, they haven't done what they said they were going to do. If it were the respondents presented and they say, see, we've done what we, look at our good faith, we've done what we said, but. They've done what they've said, Your Honor. I'll turn it on its head. They've done what they said. What they said they would do cannot achieve what the biological opinion says is required. And here I would. Do you want to? You're at six and a half minutes. I don't know whether. I want to proceed quickly through this. This is in the biological opinion. I would have the Court look at this. It is at page, I believe, at page 372. It's headed, likelihood of achieving target FPS values. I want anyone who reads that and finds the answer to likelihood out of that to come see me because I am missing something that is there. There is no discussion. There is no informed decision whether the measures that are for downstream protection, which is the key item for everything else, everything else hinges on that. That is the only reason that they abandoned the upstream passage facilities that exist and are walled off now at Mayfield was that they could not ultimately bring the juveniles down and you have to have the two-way street here in order for that to work. There is nothing there that says anything other than we accept Tacoma's promise again to achieve what they said they were going to do the first time around, but this time we mean it. If you look at everything that was cited as evidence of achieving between 75 and 95 percent fish passive survival, there is nothing that does not say we assumed it. There is one that says we assumed it for purposes of deciding if the gulpers are the next step or something else is the next step. They have never been assessed. There is also nothing in the record. I asked the court to look at each page of record that Tacoma and the respondents cite for the decision that 75 percent is adequate. These EDT studies, there is nothing there that says that that is adequate. The reason that's there is that's where Tacoma wants to stop spending money. The settlement agreement, which is something of the old boys getting together for the next term, was a compromise without scientific basis for that. Again, when you look at the upstream passage, it is also that a rational course has not been taken. To evaluate FOIL plans for fish ladders and then see if reliance on trap and hull could be dispensed with would have been the rational course as a result of what you have from NMFS. And NMFS says this is a draft policy. They never take it out of draft. That draft is their best science and policy, which is you plan for fish ladders. Your fallback is trap and hull. What they've been saying in their brief now is, no, trap and hull is better. Then why is it that there is this calculated way of determining when there will be upstream passage? Again, the old license is relevant. If you were to investigate this, would the commission look at how much Tacoma did not spend? Would that have been a more rational way of determining whether they should put fish ladders in right now? Again, as well, if the proper Jeopardy conclusion had been reached under ESA, the agencies would never have allowed what is taking place, which is a 15-year experiment with a limited number of fish, limited trigger species. There is nothing in the ESA designations that says fall chinook versus spring chinook, fall or summer steelhead versus other species. It doesn't consider coho, which is now a listed species in a designation that was made after the filing of this case. You must compare it with the Bonneville plan, which intended to maximize production up there. Under ESA, if the National Marine Fisheries Service had come out with a Jeopardy decision, Jeopardy opinion, reasonable and prudent alternatives would have required the examination not of what would be a quote-unquote appropriate way of seeing if you could raise it up a little bit, but it would have looked at what is the most prudent course for avoiding Jeopardy. I want to turn very briefly to flood control just to be a... You can use all your time if you want, that's okay. I want to be very close just to say that it's apples and oranges. Two different provisions of the license are involved. This is not an environmental issue. This is flood control. If you look at page 666 at the record, you see what the Army Corps had before them, which is you have a silted river, you have all the silt coming down from Mossy Rock, should we do anything? No, let's just keep what we had. Is that a rational decision or is that arbitrary and capricious under the Administrative Procedure Act? Finally, I would want to say that under the Federal Advisory Committee Act, I'll make very brief, an advisory committee, if it walks and quacks like a duck, it is a duck. I would look at the fact that its own minutes talk about the fact that it is not just an ad hoc committee and, in fact, meets regularly to make policy. I'll reserve the rest for rebuttal. Thank you for your argument. Good morning again, Your Honors. We have allotted the time as follows. I will have nine minutes, counsel for National Marine Fisheries will have nine minutes, and counsel for Tacoma will have two minutes. All right. I'd like to begin by emphasizing that the environmental conditions imposed in this case. And you're here for FERC, right? Yes, ma'am. Represent the environmental conditions imposed in these orders represent a consensus reached after four years of negotiation that represents a consensus between a broad array of parties, including Tacoma, the Federal Natural Resource Agencies, State and Local Natural Resource Agencies, and Indian Tribe and Conservation Groups, American Rivers, and Tribe Unlimited. Moreover, despite the consensus and the four years that it took to reach this consensus, the commission did, in fact, give a hard look at the conditions as evidenced by the statutory provision. I'll begin, then, on addressing the points raised by counsel for petitioners. First of all, on compliance, the commission is required by FDA Section 15A.3 to consider the existing licensee's record of compliance with the conditions in the ongoing license. The commission reasonably interpreted that statutory provision as requiring the agency to look at the information already existing in the administrative record, and not as requiring the agency to create information that didn't already exist. We submit that this is a very reasonable interpretation of the requirements for the license. Well, the way I understood petitioner saying that he agreed that you didn't have to, that it didn't require an investigation, but he said you already lost in court one time and you did it long before, and so you had to deal with that more directly. In the first college court case, the court found that, in fact, there was a material issue of fact, so that the commission could not summarily dismiss the complaint without going on with some sort of additional proceeding. The court also found, however, that the commission had virtually unreviewable discretion as to whether to institute an investigation. And as the orders challenged here indicate, and as the commission discussed in a great deal of detail in these orders, it made no sense to institute an investigation at this point. We're looking at a license that was coming up for renewal. The existing license had been in effect for 50 years. The commission already had a record of compliance, and as the commission detailed in the orders, Tacoma had, in fact, complied with the conditions. Now, petitioners argue that the investigation could have shown that somehow Tacoma was at fault and that the environment was degraded because of the fault of Tacoma for not complying. However, as the commission pointed out in the orders, what the commission looks at is, and the resource agencies, what they look at is what is the state of the resources now, and what measures do we need to impose to protect and enhance those resources for the future. This is what the resource agencies did. This is what FERC imposed. The issue of what is needed for the future depends upon the existing condition of the resources. It doesn't depend upon whether what Tacoma did or didn't do in the past. And the commission also indicated that it was not reasonable to conduct an investigation in this proceeding because we want to get this license renewed. Everybody, even petitioners, will agree that the conditions to be imposed in the new license were better than the conditions imposed in the old license. An investigation on the allegations that petitioners raised would have taken a lot of resources and a lot of time, would have delayed imposition of conditions that would enhance the environment, and the commission concluded that it would not institute an investigation now. Instead, it would devote its time and resources to imposing conditions that would, in fact, enhance the environment for the future. One of the things I think that he spoke about at the end was the committee, or in terms of that obviously they want a seat at the table in terms of to, if the fisheries technical committee consists of federal agency representatives, why doesn't it qualify as an advisory committee under the Federal Advisory Committee Act? Under the Federal Advisory Committee Act, a committee is a federal advisory committee if it is established by a federal agency or if it is utilized by a federal agency. And utilized has been construed very narrowly by the Supreme Court and by the Ninth Circuit. In this case, and it's clear through the settlement of articles, through the conditions imposed by the commission, we've got these cited in our brief, the purpose of the fisheries technical committee was to advise Tacoma Power. Tacoma Power is required by the license conditions to come up with the various plans and implementation of various projects to enhance and protect the environment. It is going to do this based upon the recommendations of the best science available, which it will get through the fisheries technical committee. It will put together its plans. Those plans will then be submitted to National Marine Fisheries. And if those plans are approved, in some cases, they will then further be submitted to the commission. Because the fisheries technical committee advises Tacoma Power, it does not advise a federal agency. It is not a federal advisory committee. It just isn't. Okay. Thank you. If you have no further questions. The panel members do not appear to have other questions of you. Okay. I will see the rest of my time to public comment. All right. Thank you. Were you giving it to him? Okay. Or were you giving it to Tacoma? May it please the Court. I am David Shilton from the Department of Justice. I represent the intervener respondents who are National Marine Fisheries Service, U.S. Fish and Wildlife Service, and Corps of Engineers. But I plan today to focus my remarks on the adequacy of the biological opinion, which is a National Marine Fisheries Service document. Basically, petitioners disagree with two aspects of that biological opinion. They disagree with NMFS's conclusion that the mitigation measures for downstream fish passage past these dams will be adequate to avoid jeopardy, and they also disagree with the conclusion that the continuation of the trap and haul operation to get adult salmon that's upstream will be adequate to avoid jeopardy. Now, review of the biological opinion is under the highly deferential, arbitrary, and capricious standard, and this circuit has made clear that the judgments that are made in a biological opinion are scientific judgments and that the fishery agencies, NMFS in this case, is the body that's been vested by Congress with the responsibility for making these judgments, and as such is due a large degree of deference in making these difficult calls about biology. That's clear from the Selkirk Conservation Association case that we've cited and also the Southwest Center for Biological Diversity case that are cited in our briefs. It's also significant, I think, in this case, as was mentioned by the counsel for FERC, that the proposals here for mitigation came out of this settlement agreement process, and this wasn't just the old boy network. This was the State of Washington Fisheries Agency and their Department of Ecology. It was all of the federal environmental agencies. It included American Rivers and Trout Unlimited, who are usually on a different side of the table than these federal agencies on these issues, and so I think that indicates that we're certainly not alone in believing that these measures will be adequate, in this case, for the fish. And so we're not just dealing with Tacoma's promise here, as Petitioner said. We're dealing with mitigation measures that were carefully vetted by a whole bunch of groups. The decisions seem to be, well, let's see how it will work out. We think we're going to achieve 90 percent within, what was it, three years' recovery, but if not, then it should be at least 70 percent. Am I right in those terms? That's right. This is for the downstream fish passage, that the target is 95 percent survival or 75 percent with best available technology. So if they can't, they've got to do everything they can to meet 95, but if it turns out that 75 is all they can get with best available technology, that will meet the target. What if they don't get 75? Then they'll have to look at this again. That will be an occasion where consultation under the Endangered Species Act can be reinitiated and additional measures could be required, say. And the license leaves that open for it. Yes, the license leaves that open. All of these conditions are incorporated into the license, so these are binding on Tacoma. And so we will get a chance at the end of the three-year period to assess, and if they're not meeting the targets, then they may have to do other kinds of approaches, maybe habitat-based approaches. So there are a number of things that can be done. We also measure the three years a bit differently than Petitioner has suggested. Because the license was amended to incorporate NMSA's own conditions from the biological opinion, the three years actually starts to run from that amendment. So the three years will be concluded next summer, July of 2007. So those rates, the 95 percent or 75 percent, are ambitious. We recognize that. But the job of NMSA in doing a biological opinion is to determine whether the proposal that's presented, that came out of the settlement agreement, will avoid jeopardy. And the science, the existing science, indicates that this should avoid jeopardy. And I think an important case in that regard from this circuit is the Selkirk Advisory Committee, the Selkirk Conservation Committee case, which we've cited, because it focuses on this exact issue of mitigation when the wildlife agency, in that case the Fish and Wildlife Service, depended on mitigation in order to find lack of jeopardy. It was challenged by environmental groups. And this court found that as long as that mitigation is supported rationally by the science in the record, that it really is a scientific call that the court will defer to the agency on as to whether that is going to be successful or not. And I think that the standard that the petitioners try to impose here, which they draw from a district court case called the Center for Biological Diversity versus Rumsfeld, and would require a showing that success is guaranteed, basically, that that is not the standard that this court has followed in cases like Selkirk. This court has recognized that when you're dealing with biology, there are uncertainties, and that sometimes an adaptive management-type approach, which is what we're following here, we've set a high target, and they've got to try to meet it with, they're first going to try fish screens. If that doesn't work, then they're going to have to do more. They may have to institute this gulper system at the head of Rife Lake below Cowlitz Falls, and then we'll assess that, see what the data shows. This is an adaptive management kind of regime, and it was the same sort of situation that was involved in the Selkirk case, and this court said that that is appropriate. The agency can rely on that as long as these conditions are binding, which they certainly are here. So I think you can continue to check things as you go along and see if they're working. I think that there's support in the case law for that. But you can't defer considering things, right? That's right. Why didn't that happen here? Well, full consideration was given to all of the fish passage questions based on all of the best scientific information that was available at the time of the biological opinion. And so this isn't a case like the – there's a Confederated Tribes of the Yakima Nation case back from the early 90s where the FERC had completely We'll just deal with it in the future. Right, and said, you know, we don't need to deal with fishery issues here because we've got a proceeding in the future. That's in direct contrast to the situation here where all of the issues were dealt with to the extent we possibly can based on the information that we have, but because we don't have complete information, as we almost never do with respect to species, we've allowed ourselves the ability to make decisions later on based on new information that comes in. But, again, very ambitious targets have been set to make sure that Tacoma does everything possible to help with these fish going both downstream and upstream. Now, with regard to the upstream passage that the petitioner has mentioned here, NIMS policy, which says more or less that volitional passage is preferred, but then he didn't quote the rest of it, which said, unless site conditions dictate otherwise. Now, here you have a situation where for the upper Cowlitz populations of Salmonids, there are three dams to deal with. Mayfield down below, Mossy Rock, which is the very high one, and then Cowlitz Falls, which belongs to Lewis County. So if you, and they've asked for a fish ladder immediately at Mayfield Dam, but even if you did that today, you'd still have the problem with Mossy Rock. You'd still have to tramp and haul to get around Mossy Rock and then Cowlitz Falls. And so the current system of tramping and hauling, the adult fish coming upstream are trapped below Mayfield Dam and they're trucked basically up into the upper basin. That is working well. There's a high survival rate there. And so it was reasonable for NIMS to rely on that fact to find that the upstream passage was not going to jeopardize species. I don't want to take time away from Tacoma. Are there any questions on either upstream or? That's a pretty clear argument. All right. I think you've answered our questions. Thank you. Thank you. Good morning. Matt Love from the City of Tacoma. I first want to just address the filing from yesterday and explain why we believe it's inappropriate for the petitioners that presented it at that time. First, it is the 14 documents that were submitted are post-decisional documents that are not relevant to decisions and to the issues that were presented. And then second, these documents have been in existence for a long time. For a petitioner to file them the day before the hearing without providing counsel an opportunity to review them is very problematic. With respect to my two minutes, I just want to address two issues. Well, you actually have three minutes and 25 seconds, so go ahead. I'll try to keep to two minutes, though. With respect to my two minutes, I want to first provide the Court, again, with some context. And then second, I want to really focus in on the petitioner's primary issue, the issue of whether or not FERC has adequately considered Tacoma's compliance record. With respect to the context, this FERC license reflects a landmark settlement. It reflects a monumental effort by diverse parties to come together to comprehensively address the fish issues in the Cowlitz River Basin. Not only do you have the federal and state fish and wildlife agencies who have come together with Tacoma, but you also have American Rivers. You have Trout Unlimited. You have the Yakima Nation. You have Lewis County. You have all come together to develop a comprehensive plan that addresses fish production, fish habitat, fish passage, water quality, and in-stream flow. It is truly a comprehensive settlement that both FERC and National Marine Fisheries Service have methodically reviewed. Now, turning to petitioner's primary argument that FERC did not take into consideration the compliance record as required by Section 15A.3, the record does not support petitioner's arguments. Pursuant to the Federal Power Act regulations, Tacoma submitted an Exhibit H, which outlines its compliance history. FERC considered that Exhibit H. But it did more. It reviewed the files in its regional office. It reviewed the files in the Hydropower Administrative and Compliance Record Office. It reviewed eLibrary to determine whether or not there had been any violations. And it determined that there was no violations. But it did more. Was that because Tacoma has said that it would attempt certain things or try to do certain things and they had not done that, but that that was okay because under the license all they had to do was monitor it and they were going to continue to monitor it? Because Mr. Files says the look at the record showed that they had not done what they said they were going to do. Is that correct? There's several issues that are kind of intertwined in that question and intertwined with the petitioner's statements. The first is there's no dispute that Tacoma has complied with the procedural requirements, made the proper filings and whatnot. Okay. But then there was some additional allegations of FERC license violations. And for those, one deals with a flood issue and one deals with a wetlands violation issue. And FERC specifically investigated those and found that those allegations were without basis. And then obviously the third issue deals with this 1987 agreement between Tacoma and Washington Department of Fish and Wildlife. And that third issue is the issue that's really driving petitioner's arguments. They felt that Tacoma hadn't complied with that settlement agreement. And what's significant about that is they brought that up to the Ninth Circuit. And that's the original Ninth Circuit opinion. And the Ninth Circuit said, well, the legal basis that FERC used to decline investigating, which was, well, it's not part of the FERC license, so therefore we don't have to investigate. That was an error. Instead, what they found was, well, it could have been considered part of the FERC license because there's an obligation in the previous license that WDFW or, excuse me, that Tacoma worked with WDFW. And so arguably this could have been. Then they took a step back and said, that said, you don't, FERC, you, excuse me, FERC, you do have discretion, absolute discretion, whether you're going to investigate or whether you're going to take an enforcement action. So FERC did make that statement. When it went back down, FERC said, well, we're going to exercise that absolute discretion not to investigate because it's not really relevant for what we need to do right now in this relicensing process. So I know my time is up, but I just want to make two more points. Two more points. The first is that ---- Well, I think your question, I think your time is up. Okay. Thank you. You answered my inquiry. Yeah. Oh, I'm sorry. And it's really our time. That's why people forget an oral argument. It's really ours. We just, for you to answer our questions. Thank you for your argument. Well, I appreciate that. Thank you. Thanks. During my time left, I'm going to have to speak like one of those commercials. Our time? The time? One minute and 24 seconds? They've attached the wrong agreement. It was the 1967 agreement, not 1986, and I would, when I get asked Tacoma to correct that on the record. There was another complaint which was never investigated, and it's mentioned in the Frentz-McCallots complaint, Record 493, and that is that the State of Washington Department of Fisheries complained, and there was nothing done about that. That's in the record of the regional office and in the national office. Nothing was looked at that during the compliance. They don't have absolute discretion here. The Federal Power Act says they must take that into consideration. They did have consideration. According to this Court, they had enforcement discretion before. They don't have it now. This isn't, as was said, a renewal. This is a new license. It is not a renewal of an old license. And it is, in Judge Kaczynski's definition in the Yale Law Journal of chutzpah, real chutzpah, for them to say, well, the baseline is the degraded condition of the resource. Just because we cause it to be degraded, you should still use it. Isn't it relevant to look at what the condition of the resource should have been to require the licensee to use that as their baseline rather than for them to slip further down? There is no question that the licensee must continue to try. The question is, relative to the Jeopardy decision, did nevertheless trying produce a situation where it was likely to have the extinction of the species? According to what the agency looked at, it is. And according to Pacific Coast Federation, that is arbitrary and capricious 2005 Ninth Circuit decision, which really sets the bar evenly on what must be taken into account when this Court reviews the biological opinion. Thank you, both sides, for your excellent argument in this matter. This case will now stand submitted. The Court's going to take a very short recess of about five minutes, and then we'll resume for the last case. I just wanted to comment. I thought your arguments were very good from all counsels. You did good work on this case. Thank you, Your Honor. All rise. The case is submitted.
judges: Thompson, Tashima, Callahan